DETAINED

**United States District Court
for the District of Columbia**

Jean Marc Nken
A# 95223548
Howard County Detention Center
7301 Waterloo Road
Jessup, MD 20794

| | | |
|---|---|---|
| Jean Marc Nken, | ) | |
|    Petitioner, | ) | **Case No. 08-cv-1010 (CKK)** |
| | ) | |
| v. | ) | |
| | ) | **Petition for** |
| Michael Chertoff, Secretary of | ) | **Habeas Corpus** |
| Department of Homeland Security, | ) | |
|    Respondent | ) | |

**FIRST AMENDED PETITION
FOR A WRIT OF HABEAS CORPUS**

**I.    INTRODUCTION**

1.      The dual bases for this habeas corpus petition are Petitioner's absolute treaty-

based and statutory right not to be returned under any circumstances to a situation of

torture under Article 3 of the Convention Against Torture, ratified by the United States

and fully implemented and enacted as part of U.S. law by domestic statute, Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment

("CAT"), entered into force June 26, 1987, 39 U.N. GAOR Supp. (no. 51) 197, U.N.

Doc. E/CN.4/1984/72 Annex (1984); Foreign Affairs Reform and Restructuring Act of

1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21,

1998) (codified as Note to 8 U.S.C. § 1231), and his fundamental Due Process liberty interest in not being deported while legal proceedings are pending to adjudicate valid claims currently being considered by the immigration courts. These rights are being denied because the U.S. Government is attempting to deport the Petitioner while he has a Motion to Reopen his CAT claim based on changed country conditions pending before the Board of Immigration Appeals ("BIA"), and new evidence has been presented to the BIA regarding the threat of torture that Petitioner faces, including the recent arrest of his brother. A key part of the basis for the Government's deportation effort also is based on its arbitrary administration of the ISAP supervised parole program that forced the Petitioner into a noncompliance situation that led to his deportation, or imminent deportation.

2.      This case also raises significant Constitutional issues under the Suspension Clause. The Court's consideration of the jurisdictional issues under the REAL ID Act in connection with the Petitioner's emergency request for a stay of deportation provided clear support for the concern expressed by the Court that if the Government's interpretation of the habeas restrictions imposed under the REAL ID Act is upheld, the Petitioner will have no adequate judicial remedy in this case. The Court must now address whether this represents an unconstitutional suspension of habeas corpus, given that the Petition for Review process that the REAL ID Act established as the alternative to habeas cannot, as the Government acknowledges, reach the issues posed by this habeas petition.

## II.    THE PARTIES

3.      Petitioner is Jean Marc Nken, a national and citizen of Cameroon, who is detained

in the custody of U.S. Immigration and Customs Enforcement ("ICE") at the Howard

County Detention Center, 7301 Waterloo Road, Jessup, MD 20794.  Petitioner either has

already been removed to Cameroon pursuant to the plans the Government communicated

to this Court, or is in imminent danger of removal to Cameroon where he faces a

significant likelihood of torture on account of his political opinion and associations.

4.      Cited as Respondent in his official capacity is Michael Chertoff, Secretary of the

Department of Homeland Security, who exercises titular and supervisory authority over

ICE, and over the operations of the ISAP supervised parole program, the improper

administration of which produced the situation that led to the Government's efforts to

deport Petitioner during the pendency of his Motion to Reopen proceedings that were the

subject of this petition.

### III.    PROCEDURAL BACKGROUND

5.      Petitioner's application for asylum, withholding of removal and protection under

the Convention Against Torture ("CAT") was denied by an Immigration Judge ("IJ") on

March 4, 2005.  When these proceedings were taking place he had a pending I-130

Petition for Alien Relative filed on his behalf by his U.S. citizen wife.  This application

was made to the United States Citizenship and Immigration Service to demonstrate the

bonafide nature of Petitioner's marriage to a U.S. citizen and to seek lawful status on that

basis.  Petitioner appealed the IJ's decision to the Board of Immigration Appeals ("BIA")

on March 31, 2005 and submitted a motion to remand the case to the IJ in order to apply

for adjustment of status based on his bonafide marriage to a U.S. citizen and his pending

I-130 application.

6.      On June 16, 2006 the BIA affirmed the IJ's decision and denied the motion to remand because the Department of Homeland Security ("DHS") had not yet approved the I-130 petition.  The BIA issued a final order of removal.  Petitioner filed a Petition for Review with the Fourth Circuit Court of Appeals ("Fourth Circuit") on July 14, 2006.

7.      On August 8, 2006 Petitioner and his wife had an I-130 interview with U.S. Citizen and Immigration Services.  At this interview ICE officials arrested Petitioner and placed him in detention.  Petitioner was released from detention and enrolled in the Intensive Supervision and Appearance Program ("ISAP"), a form of supervised parole, on October 30, 2006.

8.      On August 22, 2006 Petitioner's I-130 was approved, making him statutorily eligible for adjustment of status, although the Immigration Service generally takes the position that it will not grant adjustment in cases where a final order of removal is outstanding.  Petitioner's attorney submitted a letter to ICE Chief Counsel George Maugans requesting that ICE join a motion to reopen Petitioner's case for emergency medical and humanitarian reasons so that his adjustment claim could be considered.  Chief Counsel refused to join a motion to reopen for this purpose.

9.      On April 3, 2007 the Fourth Circuit denied the Petition for Review appealing the Immigration Courts' decision denying asylum and CAT protection.  On May 6, 2008 Petitioner filed a Motion to Reopen before the BIA based on changed country conditions, citing among other facts the arrest of his brother.  This motion is currently pending.

10.     On May 30, 2008 ICE officials arrested Petitioner at gunpoint outside of his and his family's home.  Petitioner was placed in detention at the Howard County Detention Center, 7301 Waterloo Road, Jessup, MD 20794.  Petitioner is currently being held in

this facility.  On June 11, 2008 he was informed by ICE officials that he will be deported

on June 16 or 17 despite his pending proceedings.  His attorney received similar

indications of imminent deportation.  *See* Gott and Larson affidavits.

11.     Petitioner filed the original Petition for Habeas Corpus on June 13, 2008.  On

June 16 and 17 the Court held telephonic hearings on jurisdictional issues under REAL

ID with counsel for both parties, solely addressing the request for emergency stay of

removal.  The Court expressed grave concerns that if it could not exercise jurisdiction the

Petitioner would be left with no access to judicial review of his claim before he was

deported.  At the June 17 hearing counsel for the Government stressed that the Fourth

Circuit Court of Appeals would not have jurisdiction to review the case until after the

BIA had made a decision on the Motion to Reopen.  The Court noted that this would

almost certainly happen after Petitioner was deported, meaning that he would not have

access to a meaningful form of judicial review prior to his deportation.

12.     On June 18 the Court denied Petitioner's emergency request for stay of removal,

citing the jurisdiction stripping provisions of the REAL ID Act and noting that it was

making no determination on the merits of the petition at that time, but only dealing with

the emergency stay request.

        **IV.    OPERATIVE FACTS**

13.     Petitioner is a 40 year old native and citizen of Cameroon.  He arrived in the

United States on April 9, 2001 in Miami and filed a voluntary application for asylum and

protection under CAT on December 5, 2001, well within the one year statutory period.

Petitioner fled Cameroon after enduring persecution and torture for his opposition to the

government of President Paul Biya and his family has been targeted for persecution because of their political opinions and activities.

14.    On November 4, 2004 Petitioner married his current wife, Brigitte Beloeck. Ms. Beloeck, a U.S. citizen, filed an I-130 on behalf of her husband on November 15, 2004. They currently have a one year old child who was born in the United States, and is a U.S. citizen. They have been happily married for over three years, living together during that entire period, as USCIS properly determined when the agency found the Petitioner eligible for adjustment to status based on his marriage and family status.

15.    Petitioner was enrolled in the ISAP supervised parole program after his arrest at the I-130 interview on August 8, 2006. His order of supervision initially required him to report to the ISAP office in Baltimore every two weeks. ISAP officials and their ICE supervisors continuously put pressure on the Petitioner to leave the United States, even though Petitioner had an appeal pending before the Fourth Circuit. ISAP representatives repeatedly told Petitioner that he should leave the United States immediately. With his approved I-130 Petitioner was eligible to receive a green card but for the deportation order based on denial of his asylum claim. Despite repeated requests, however, ICE refused to join a Motion to Reopen to allow Petitioner to adjust his status and receive a green card. At one ISAP meeting around May 2007 Petitioner's case manager told him that he would now have to wear an ankle monitor and report to ISAP five days a week. The ISAP officers gave no explanation for the extremely rigorous supervision requirements.

16.    Petitioner and his wife live at 1836 Metzerott Road, Apartment 1508, Hyattsville, MD 20083. They have a one-year old son. ISAP's requirements that Petitioner report on

6

a daily basis to the ISAP office in Baltimore required several hours commute to and from Baltimore each day and was a severe financial burden on his family. Since Mr. Nken did not have work authorization, his wife is the sole source of income for the family, despite the fact that she suffers from a debilitating medical condition. This condition, combined with her full time employment, meant that Mr. Nken had to take their infant son with him every day to his meetings with ISAP. He is the primary caretaker for his son, and increasingly has had to care for his wife as well due to her condition. Even after he received work authorization in December 2007, the rigorous ISAP reporting schedule, including the time spent commuting to Baltimore, left Mr. Nken unable to work.

17.    Petitioner's wife's illness gradually left her unable to work full time. As a result, the cost of commuting to and from Baltimore five days a week became impossible to meet. Petitioner repeatedly discussed the financial hardships that the daily supervision arrangement posed to him and his family, and repeatedly tried to work out a more reasonable arrangement, but his ISAP case managers and the ICE supervisors refused, and threatened him with deportation in retaliation for his complaints.

18.    One ISAP supervisor, Ms. Moore, told Mr. Nken that she would try to get his supervision schedule amended. She arranged a meeting with Mr. Nken and ICE officials with supervision over ISAP, Paul Welke and Brian Schuster. When Mr. Nken arrived at this meeting Mr. Welke physically pushed Mr. Nken into an office and began to yell at him. Mr. Welke told Mr. Nken that Ms. Moore had been fired for trying to assist him. Mr. Welke told Mr. Nken he should leave the country immediately. After this incident Petitioner's attorney, Ronald Richey, met with Mr. Welke. Welke told him that he was under intense pressure from ICE officials to arrest and deport Petitioner because

Petitioner had been in the country for a long time.  Richey reminded Welke that Petitioner had a sick wife and baby to care for, but Welke responded that one phone call could have the child placed in protective custody and the problem would be solved.

19.     In February of 2008 conditions in Cameroon worsened such that new and additional supportive evidence that Petitioner would face torture should he be returned to that country came to light.  President Biya announced his intention to amend the Cameroonian Constitution to eliminate presidential term limits.  The resulting protests led Biya to arrest and torture around 1600 protesters, including Petitioner's brother.  Around 100 people were killed extra-judicially by Biya's soldiers as a result of the protests.

20.     On April 10, 2008 the Cameroonian parliament voted to approve Biya's suggestion to eliminate presidential term limits despite suspicions of bribery that had been raised against the president.  The elimination of presidential term limits has essentially left Biya, president since 1982, with the ability to assume a position of lifetime dictator, further reinforcing Petitioner's renewed fear of further persecution and torture.

21.     On or around May 13, 2008 Petitioner called the ISAP office and told his case manager, Mr. Carter, that he had no money to pay for gas to get to Baltimore that day.  His case manager told Petitioner just to call in, as he had done that day, when he could not afford to come to Baltimore.  Petitioner continued to call in to his case manager rather than commute to Baltimore.  Despite his case manager's indication that this arrangement was sufficient, ICE officials determined him to be in noncompliance with ISAP requirements and came to Petitioner's apartment to arrest and deport him.  Petitioner was not home at the time and was informed of the ICE officials' visit by neighbors.

22.    On or around May 22, 2008 Petitioner called in to his case manager.  The case manager informed Petitioner that he had been removed from the ISAP program because he ws deemed in noncompliance with reporting requirements and was subject to immediate arrest and deportation.

23.    On May 30, 2008, Petitioner was arrested and detained by ICE.  ICE officials informed him on June 11, 2008 that they had acquired all of the necessary travel documents and Petitioner would be deported on June 16 or 17.  This date was later changed to June 19.  These officials told Petitioner that he was being deported as a direct result of violating the arbitrary and unreasonable ISAP supervision requirements that had been imposed on him.

24.    On June 19 ICE officials were unable to carry out their original plan to deport the Petitioner on that day because of Petitioner's continued objections based on his fear of torture .  ICE official Krysta Woodward informed Petitioner that they would reschedule his deportation within three or four weeks.

25.    Petitioner is concerned that his wife will not be able to care for their son or for herself if Petitioner is deported because of her serious medical conditions.  He also fears being removed to Cameroon where he faces torture before the BIA has adjudicated his Motion to Reopen that is currently pending.

26.    If returned to Cameroon, Petitioner faces a specific and individual threat of torture.  President Biya's military junta is actively searching for known political dissidents, including the Petitioner, and Petitioner fears he will again be targeted by Biya's regime if he returns to Cameroon, as the recent arrest of his brother indicates.

### V.    JURISDICTION

27.     This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 2241(a), (c)1 and (c)3 in that this is a petition for a Writ of Habeas Corpus, the Petitioner is in custody under the authority of the United States, and subject to action (deportation) that would place his life and security in jeopardy, "in violation of the Constitution, or laws,  or treaties of the United States."  28 U.S.C. § 2241(c)(3).  This petition raises significant federal questions including the violation of fundamental Constitutional and human rights.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").

28.     Petitioner is "in custody" for habeas purposes not only because he is currently being held by ICE officials in a detention center, but because the U.S. Government is actively seeking to arrange his deportation or has already succeeding in deporting him. *See Ying v. Kennedy*, 292 F.2d 740, 742 (DC Cir. 1961).

### A. THIS COURT HAS JURISDICTION OVER THE PARTIES EXERCISING LEGAL CONTROL OVER PETITIONER'S DEPORTATION

29. This Court has jurisdiction over the person primarily responsible for Petitioner's deportation, the Secretary of DHS. The Secretary of DHS is the proper respondent in this petition because he exercises principal and supervisory control over those federal officials making ultimate decisions regarding Petitioner's status and deportation. He is ultimately responsible for the imposition of arbitrary and unreasonable ISAP reporting requirements on the Petitioner that were impossible to meet, causing the Petitioner's arrest and deportation.

30. In *Braden v. Thirtieth Judicial Court of Kentucky*, 410 U.S. 484, 494-95 (1973), the Supreme Court stated that "read literally, the language of § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian" because "the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody," or the official responsible for an unlawful custody situation.

31. In *Rumsfeld v. Padilla*, the Supreme Court explained, citing *Braden*, that "the immediate physical custodian rule, by its terms, does not apply when a habeas petitioner challenges something other than his present physical confinement." 542 U.S. 426, 427, 124 S.Ct. 2711, 2713 (2004). Under such circumstances, when "a habeas petitioner [] challenges a form of 'custody' other than present physical confinement [he] may name as respondent the entity or person who exercises legal control with respect to the challenged 'custody.'" *Id.* at 438.

32.    "Historically, the question of who is … the appropriate respondent in a habeas suit depends primarily on who has power over the petitioner." *Henderson v. INS,* 157 F.3d 106, 122 (2d Cir. 1998).  In *Ex parte Endo*, 323 U.S. 283, 305 (1994), the Supreme Court held that national-level officials who have the power to "produce" the petitioner are the proper respondents in a habeas petition.  *See also Armentero v. I.N.S.,* 340 F.3d 1058, 1071 (9th Cir. 2003) (holding that "the most appropriate respondent to petitions brought by immigration detainees is the individual in charge of the national government agency under whose auspices the alien is detained."); *Id.* at 1068 (holding that it is "not logical to demand that an immigration detainee's petition be directed to a local or state warden who in reality has no legal power and, often, little actual power to 'bring forth the body' of the detainee.").

33.    Since this habeas petition is not focused on issues associated with the Petitioner's immediate physical confinement, but instead challenges the arbitrary and unconstitutional nature of his arrest and deportation during pendency of his Motion to Reopen before the BIA, and the causes underlying such action, the "immediate custodian rule" is inapplicable and the proper respondent is the official exercising legal control over Petitioner who is most directly responsible for the arbitrary and unlawful policies and actions being alleged.  *See Rumsfeld v. Padilla*, 542 U.S. at 438.

34.    Since the creation of DHS and the reorganization of the functions of the INS to DHS, the Secretary of DHS exercises primary supervisory authority over ICE.  Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).  Because the Secretary of DHS exercises principal and supervisory control over ICE officials and

maintains legal control over Petitioner and over the operation of the ISAP supervised

parole program, the Secretary of DHS is the proper respondent in this habeas petition.

35.     Habeas jurisdiction lies in the location of the person with legal control over the

Petitioner, not necessarily only in the jurisdiction where the petitioner is physically held

in custody.  Because the Secretary of DHS is the legal custodian of Petitioner and the

office of the Secretary of Homeland Security is in the District of Columbia, this Court has

personal jurisdiction over the official exercising primary supervisory power over the

Petitioner and over the policies and practices leading to his imminent and unlawful

deportation.

36.     Traditional venue considerations and the convenience of the parties, show that

Washington, DC is the proper venue for this habeas corpus action. *See Braden*, 410 U.S.

at 493-494.  The interest of the court in practicality, efficiency and the carrying out of

justice must also be taken into consideration when determining venue. *Id.* at 494; *see also*

*Henderson v. INS,* 157 F.3d 106, 122 (2nd Cir. 1998); *Strait v. Laird*, 406 U.S. 341, 346

(1972)(highlighting practicality and holding that the terms 'custody' and 'custodian' were

broad enough for the petitioner's case to be granted limited habeas corpus jurisdiction in

a district that gained jurisdiction through traditional venue doctrines).  In addition, a strict

application of traditional venue doctrines, rather than an "inflexible jurisdictional rule,"

effectively curbs the fears of forum-shopping by emphasizing practicality and

convenience to both parties, especially in situations where national-level figures—such as

the Attorney General or Secretary of Homeland Security—are named as respondents.

*Henderson*, 157 F.3d at 128.

37.     In line with the Supreme Court's decisions in *Endo* and *Braden,* because the office of the Secretary of Homeland Security is within the District of Columbia, this Court has personal and territorial jurisdiction over the official exercising primary supervisory power over the Petitioner and over the policies and practices leading to his imminent and unlawful deportation.  All ICE field offices and ISAP offices are overseen by DHS in Washington, DC.  The decision to create the ISAP program and vest its employees with the power to create Orders of Supervision was made in Washington, DC. Supervision and decisions for all individuals in the ISAP reporting process are carried out by DHS officials in Washington, DC.  Thus, the material decisions and determinations that were made regarding the Petitioner and that had such severe effects on him were within the District of Columbia.  All aspects of Petitioner's supervision under ISAP, including all of his case documentation, were reviewed by officials in the District of Columbia.  Thus all of the material most relevant to the case would be in Washington, D.C.

38.     In addition, practicality must play a large role when determining venue.  An inflexible jurisdictional rule that focuses solely on the location of the immediate custodian does not take account, for example, of the fact that as a practical matter many petitioning aliens are transferred frequently throughout the United States.  *Armentero*, 340 F.3d at 1069.  Strictly applying an immediate custodian rule in those circumstances necessitates a "time-consuming transfer or dismissal of the petition," as well as a waste of judicial resources.  *Id.*  Traditional venue doctrines should be used to determine venue, not an inflexible, immediate custodian rule.

39.    DHS cannot avoid responsibility for unconstitutional violations of liberty and denials of justice by alleging that the Petitioner's physical custody is in Maryland since it is not that physical custodian, but the legal custodian who is responsible for the policies and actions producing the Constitutional violations being alleged in this Petition.  Since Petitioner challenges the legality of DHS policies and actions, rather than the order of the Immigration Courts, the petition is properly filed where those policies are made and the actions overseen.

### B.  THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PETITIONER'S HABEAS CORPUS PETITION.

40.    The provisions of the REAL ID Act set forth at 8 U.S.C. § 1252, which restrict jurisdiction of the District Courts over challenges to deportation proceedings, are not applicable to Petitioner's case since Petitioner is challenging issues totally independent of the deportation proceedings themselves.

41.    Section 106 of the REAL ID Act of 2005 was enacted to "give every alien a fair opportunity to obtain judicial review while restoring order and common sense to the judicial review process."  H.R. Rep. No. 109-72 at 174 (2005).  Despite the restrictions on access to habeas in REAL ID, District Courts "retain jurisdiction over matters independent of challenges to removal orders." *Sadhavani v. Chertoff*, 460 F.Supp.2d 114, 121 (D.D.C.2006).  In 'mixed habeas petitions' the District Court retains jurisdiction over the portions of the habeas challenge that do not involve challenges to the deportation proceedings themselves, and to the final orders of removal they produced. *See Ferry v. Gonzales,* 457 F.3d 1117, 1131 (10th Cir.2006).

42.    The REAL ID Act does not eliminate habeas jurisdiction over challenges to separate issues independent of the deportation proceedings themselves.  *See Puri v. Gonzales,* 464 F.3d 1038, 1041 (9th Cir.2006) ("the REAL ID Act's jurisdiction-stripping

provisions ... does [sic] not apply [if the] claim is *not a direct challenge to an order of removal* ") (emphasis added).  *See also Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007) ("There is no reason to believe that § 1252(b)(9)'s exception for independent claims is restricted to those related to detention"); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir.2006) ("By its terms, the jurisdiction-stripping provision [of the REAL ID Act] does not apply to federal habeas corpus petitions that do not involve final orders of removal."); *Kumarasamy v. Att'y Gen.*, 453 F.3d 169, 172 (3d Cir.2006) (habeas petition appropriate to challenge whether petitioner received notice of removal order); *Ali v. Gonzales,* 421 F.3d 795, 797 n. 1 (9th Cir.2005) (habeas jurisdiction upheld for challenge to choice of removal country).

43.    The Third Circuit acknowledged the retention of habeas jurisdiction by federal District Courts in *Nnadika v. Att'y Gen. of U.S.***,** 484 F.3d 626, 632 (3d Cir.2007):

> We must be careful to maintain the distinction Congress made in the REAL ID Act between those challenges that must be transferred and those that must be retained in and decided by the district court. Arguably, any challenge by an alien who seeks to remain in        this country could be construed as challenging his or her "removal, deportation, or exclusion," but such a broad interpretation would be counter to Congress' express intent.

44.    Three provisions of § 1252 are particularly relevant to Petitioner's claims.  First, subsection (a)(5), entitled "Exclusive Means of Review," stipulates that:

> Notwithstanding any other provision of law (statutory or nonstatutory), including
> section 2241 of Title 28, or any other habeas corpus provision, and sections 1361
> and 1651 of such title [the mandamus statute and the All Writs Act], a petition        for review filed with the appropriate court of appeals in accordance with this        section *shall be the sole and exclusive means for judicial review of an order of*
> *removal entered or issued under any provision of this chapter*, except as provided in subsection (e) of this section.  For purposes of this chapter, in every
> provision that limits or eliminates judicial review or jurisdiction to review, the        terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other

provision of law (statutory or nonstatutory.)

45.    As the sole and exclusive means for judicial review of orders of removal, a petition for review grants petitioners challenging an actual order of removal "a day in federal court." *See Sadhavani v. Chertoff*, 460 F.Supp.2d 114 (D.D.C.2006).  But the Petition for Review process, as the present case demonstrates and as the Government has acknowledged, cannot reach challenges that are not focused on the subject matter covered in the immigration court proceedings.  Habeas petitions that do not expressly challenge these proceedings and the orders of removal, deportation or exclusion they produce can only be dealt with by the District Courts through habeas proceedings.  In recent years, District Courts have exercised jurisdiction over habeas petitions raising a myriad of issues that were independent from deportation, including the length, propriety and constitutionality of detention.  *See*, *e.g.*, *Sissoko v. Rocha*, 440 F.3d 1145 (9th Cir.2006) (holding no challenge to an order of removal where an alien brought claims against an immigration inspection office alleging he was improperly detained); *Verdugo-Gonzalez v. Ridge*, No. 07cv0402, 2008 WL 170018 at *2 (S.D.Cal. Jan. 17, 2008) (concluding that the propriety of detention is a consideration independent of removal and retaining habeas jurisdiction); and *Nyemba v. Prendes*, No. CIV-06-0772-HE, 2006 WL 3300448 (W.D.Okla. Oct. 24, 2006) (implying that challenges to the length of detention, conditions of confinement or the constitutionality of a detention statute are separate issues independent of removal proceedings).

46.    To conclude that a petition for review is the "sole and exclusive means of judicial review" of Petitioner's due process challenges directly contradicts the plain language of the statute, and the practical reality that many of the Petitioner's claims do not address matters that were covered in the immigration court proceedings and that would be subject to appeal through a Petition for Review.  The statute expressly limits petitions of review to direct challenges to orders of removal.  Here, Petitioner requests judicial review of the arbitrary and irrational supervision requirements imposed on him by ISAP and ICE that

have placed him under a threat of deportation, and issues associated with his removal

during the pendency of administrative claims under his Motion to Reopen.  Moreover,

such a conclusion undermines Congressional intent.  Depriving Petitioner of a fair

opportunity to present his due process challenges in a habeas petition would vitiate

Congressional intent and undermine the purpose to "restore order and common sense" to

the judicial review process.  See H.R. Rep. No. 109-72 at 174 (2005).

47.     This deprivation is especially disconcerting in light of the fundamental judicial

inequity between habeas and petition for review proceedings.  Unlike District Courts,

Circuit Courts of Appeal cannot engage in *de novo* fact-finding.  If salient facts are

missing from the record, the Circuit Court will be unable to consider them in a Petition

for Review, which by its nature is limited to review of the record from the proceedings

below.  Without an opportunity to add relevant facts to the record, and to deal with issues

arising after the deportation proceedings were completed, a petitioner in Circuit Court

Petition for Review proceeding will be denied a full and fair review of his or her claims

on the merits.  This system is hardly the orderly, sensible mechanism for judicial review

envisioned by Congress when it enacted the REAL ID Act.

48.     Second, subsection (b)(9) – entitled "Consolidation of Questions for Judicial

Review" provides:

> Judicial review of all questions of law and fact, including interpretation and
> application of constitutional and statutory provisions, *arising from any action
> taken or proceeding brought to remove an alien from the United States* under this
> subchapter shall be available only in judicial review of a final order under this
> section. Except as otherwise provided in this section, no court shall have
> jurisdiction, by habeas corpus under section 2241 of Title 28, or any other habeas
> corpus provision, by section 1361 or 1651 of such title, or by any other provision
> of law (statutory or nonstatutory to review such an order or such questions of law
> or fact.

49.     Although this provision creates "an explicit bar on habeas jurisdiction over certain claims, the Act did not expand the scope of (b)(9) by making it applicable to cases other than those involving 'review of an order of removal.'"  *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir.2006).  Since "§ 1252(b)(9) applies only 'with respect to review of an order of removal,' and this case does not involve review of an order of removal, [the Eleventh Circuit] found that § 1252(b)(9) did not apply in this case."  *Id*.  Likewise, this statutory provision does not affect Petitioner, as his habeas petition does not arise from any action taken or proceeding brought to remove him from the United States.  Instead, Petitioner's need for judicial review arises from due process issues associated with the arbitrary and irrational supervision requirements imposed on him, and the threatened violation of the Convention Against Torture raised by his deportation while pending administrative proceedings are in process.  Because these claims do not arise from his removal proceedings, they cannot be reviewed by the Circuit Court of Appeals in the Petition for Review process and are properly raised in a habeas petition before the District Court.

50.     Finally, subsection (g) – "Exclusive Jurisdiction" stipulates:

> Except as provided in this section and notwithstanding any other provisions of  law (statutory or nonstatutory), including section 2241 of Title 28, or any other  habeas corpus provision, and sections 1361 and 1651 of such title, no court shall  have jurisdiction to hear *any cause or claim by or on behalf of an alien arising  from the decision or action* by the Attorney General to commence proceedings,  adjudicate cases or execute removal orders against any alien under this chapter.

51.     The District Court for the District of Columbia adopted the Supreme Court's application of 8 U.S.C. § 1252(g) in *Liu v. Novak*, 509 F.Supp.2d 1 (D.D.C.2007).  As stated in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 119 S.Ct.

936, 142 L.Ed.2d 940 (1999), this provision "applies narrowly to the Attorney General's decision to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Id*. at 482.  The *Reno* Court noted that "[t]here are of course many other decisions or actions that may be part of the deportation process – such as the decisions to open an investigation, to surveil the suspected violator, [and] to reschedule the deportation hearing." *Id*.  Yet, these "other decisions or actions" are not the focus of § 1252(g).  *Id*. Moreover, the Court in *Reno* concluded that it "[was] implausible that the mention of three discrete events along the road to deportation was a shorthand way of  referring to all claims arising from deportation proceedings." *Liu v. Novak*, 509 F.Supp.2d 1, 8 (D.D.C.2007).  It follows that "it is even less plausible that the mention of these discrete deportation-related events was a shorthand way of referring to all claims brought in immigration matters." *Id*.

52.      The tendency to construe § 1252(g) narrowly is clearly reflected in recent case law.  The Third, Fourth, Ninth, and Eleventh Circuits have elected to remand habeas petitions to the District Courts and maintain District Court habeas jurisdiction despite the fact that the challenges seemed tangentially related to removal proceedings.  *See*, *e.g.*, *Igwebuike v. Caterisano*, 230 Fed.Appx. 278 (4th Cir.2007) (concluding that the REAL ID Act did not apply to petitioner's challenge of the District Director's determination that he was ineligible for an adjustment of status); *Kumarasamy v. Att'y Gen.*, 453 F.3d 169, 172 (3d Cir.2006) (holding that an alien who is challenging the legality of removal because he allegedly never received notice of his removal order is "not seeking review *of* an order of removal"); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1366 (11th Cir.2006) (holding that a "petitioner who contests the very existence of an order of removal does not seek 'review of an order of removal' within the meaning of the REAL ID Act"); *Ali v. Gonzales*, 421 F.3d 795, 797 (9th Cir.2005) (order denying reh'g) (noting that jurisdiction-stripping provisions of the REAL ID Act do not

apply to a claim that petitioners may not be removed to a country that does not have a functioning government, "because petitioners do not challenge or seek review of any removal order"); and *Singh v. Chertoff*, No. C05-1454, 2005 WL 2043044, at *3 (N.D.Cal. Aug. 24, 2005) (holding that termination of petitioner's asylum status falls outside the scope of the jurisdictional bar of the REAL ID Act).

53.     Likewise, the challenges raised by petitioners in *Kellici v. Gonzales* were not considered a challenge to the order of removal. 472 F.3d 416 (6th Cir.2006). Accordingly, the Sixth Circuit Court of Appeals moved to dismiss and remand the petitioners' habeas petitions to District Court on the ground that it lacked jurisdiction over the petitioners' Due Process claims related to inadequacies in the notice provided to them on their deportation orders. Because their habeas petitions challenged the constitutionality of the arrest and detention, *not* the underlying administrative order of removal, the Sixth Circuit determined that it was not authorized to review the claims as part of the Petition for Review process under the plain language of § 1252 as amended by the REAL ID Act and that the District Court should have retained habeas jurisdiction over those claims.

54.     Here, the Due Process violations Petitioner describes in his habeas petition do not directly challenge his order of removal, but raise challenges not directly associated with the deportation proceedings in the immigration courts. But for the impossible reporting requirements imposed on him by ISAP, petitioner would have continued to comply with his supervision order, and ICE would not have arrested him or begun the process of deporting him. This claim and the Petitioner's other Due Process and CAT based claims are independent of the issue of the lawfulness of the underlying removal order and does not fall under the jurisdiction stripping provisions of REAL ID. Thus, the District Court for the District of Columbia should retain jurisdiction of Petitioner's habeas petition.

## VI.     THE PETITION FOR ISSUANCE OF A WRIT OF HABEAS CORPUS

55.     Paragraphs 1 through 54, inclusive in this document, are incorporated herein by reference as though set out fully at this point in the Petition for Issuance of a Writ of

Habeas Corpus. This Petition raises a number of core legal and Constitutional issues associated with the arbitrary treatment of the Petitioner that have materially infringed on his Due Process rights as a resident alien.

56.    In light of the fundamental legal and Constitutional issues raised by this Petition, the Petitioner is entitled "to a meaningful opportunity to demonstrate that he is being unlawfully held and deprived of his rights pursuant to [a violation of the U.S. Constitution]" and this Court has "the power to order the conditional release of [the] unlawfully detained [Petitioner]." *Boumediene v. Bush*, 553 U.S. ____ (2008).

**A. THE COURT'S DECISION OF JUNE 18, 2008 DENYING JURISDICTION ON REAL ID GROUNDS LEAVES PETITIONER WITH NO EFFECTIVE JUDICIAL REMEDY, RAISING SIGNIFICANT SUSPENSION CLAUSE ISSUES.**

57.    At the Court's telephonic hearing of June 17, 2008, under persistent questioning by the Judge, counsel for the Government repeatedly acknowledged that the Petitioner had not yet exhausted his administrative remedies since his motion to reopen based on changed conditions that created a new and strengthened asylum and Convention Against Torture claim was still pending before the immigration courts. Counsel for the Government also acknowledged, under what Petitioner's counsel would characterize as concerned questioning by the Court, that Petitioner's deportation under these circumstances could not be challenged **IN ANY COURT**, since under the habeas and other judicial review stripping provisions of the READ ID Act the **ONLY** court that would be available to the Petitioner for such a claim was the Fourth Circuit Court of Appeals, and then only in a Petition for Review proceeding after the merits of the pending motion were decided. Government's counsel noted that such a proceeding could not be used to challenge the denial of a motion for stay of removal by the Board of

Immigration Appeals until after the BIA had acted **ON THE MERITS** to deal with the

pending Motion to Reopen.  Under REAL ID, as counsel for the Government stressed, no

court could review the BIA's denial of a stay of removal until the proceedings during

which the Petitioner needed a stay had already been completed.  The Court noted in its

June 18, 2008 memorandum order that this situation produced "draconian results"

because "the Fourth Circuit will not obtain jurisdiction over the Petitioner's request for a

stay of removal until Petitioner has exhausted all available administrative remedies."

Thus, unless action were to be taken by the Court under its independent habeas authority

to stop the deportation, Petitioner could be deported before his Motion to Reopen was

adjudicated, leaving him without an available judicial remedy.

58.     In essence, because of the jurisdiction stripping provisions of the REAL ID Act,

Petitioner has been placed in a perfect Catch-22 situation, and in exactly the situation that

the Suspension Clause was designed to prevent.  Without habeas corpus because of the

REAL ID Act he cannot challenge the administrative action being taken against him by

the Executive Branch that amounts to one of the worse forms of deprivation of liberty –

deportation to a situation of serious persecution and torture.  He is left without any

meaningful judicial recourse, despite facing a situation of likely persecution and torture –

a situation that U.S. statutory and treaty law prohibits on an absolute basis.  Before REAL

ID Petitioner could challenge this action through the habeas process.  Under REAL ID, as

both the Government and the Court have acknowledged, he has been denied access to

**ANY COURT** to challenge this arbitrary, unlawful, and unconstitutional action,

including through the Petition for Review process.  Petitioner's forced deportation

without being given an opportunity to exercise and exhaust his lawfully authorized

administrative remedies constitutes a textbook case demonstrating why the alternative form of judicial review provided by REAL ID in place of habeas is a totally inadequate and ineffective substitute for habeas protections and a violation of the Suspension Clause.

59.     This Suspension Clause problem is exacerbated if the Court's decision to deny a temporary stay of deportation is extended still further by denying him access to habeas review on the merits of his Due Process violation claims.  The Court's determination that it was without jurisdiction to grant a temporary stay of removal was based primarily on 8 U.S.C. § 1252(g) which governs "the decision or action by the Attorney General to…execute removal orders."  As explained below, this interpretation places the REAL ID Act in violation of the Suspension Clause.  This provision, however, is not applicable to the merits of the Petitioner's claim.  The issues of the constitutionality of the requirements imposed as part of the ISAP program, and the lawfulness of a deportation while an administrative proceeding is still pending, do not involve the decision to execute a removal order, and thus habeas jurisdiction to review those requirements is not governed by 1252(g).  Nor, should they be governed by other habeas and judicial stripping provisions of REAL ID since they involve matters outside the scope of the Petition for Review process.  The application of REAL ID to limit Petitioner's access to the courts would raise serious Suspension Clause problems.

    **1.   The REAL ID Act, as Applied to Petitioner, Has Unlawfully Eliminated Habeas Corpus Without Providing an Adequate and Effective Substitute, in Violation of the Suspension Clause.**

60.     The Government may not suspend Habeas Corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it."  Suspension Clause, U.S. Const., Art. I, § 9, cl. 2.  The Government may replace Habeas Corpus with other forms of

judicial review if the substitute procedures are "adequate and effective" and essentially equivalent to habeas protections. *Boumediene v. Bush*, 2008 WL 2369628, 42 (2008). *See also INS v. St. Cyr,* 533 U.S. 289 (2001). Federal courts, including the Supreme Court, have spoken many times to the issue of what constitutes an "adequate and effective" substitute for habeas review. The substitute procedure must amount to what the Third Circuit called "the substantial equivalent of the conventional writ of habeas corpus." *U.S. v. Anselmi*, 207 F.2d 312, 314 (3d Cir. 1953). According to the Supreme Court, any alternative to habeas corpus should be "identical in scope to federal habeas corpus," *Davis v. U.S.*, 417 U.S. 333, 334 (1974), *Davis v. U.S.*, 417 U.S. 333, 334 (1974), and must prove adequate and effective "to test the legality of a person's detention." *Swain v. Pressley,* 430 U.S. 372, 382 (1977). *See also U.S. v. Hayman*, 342 U.S. 205, 223 (1952) (finding constitutional a statute creating a substitute for habeas review that preserved the writ of habeas corpus for situations where the substitute proved inadequate).

61.     8 U.S.C. §1252(a)(5), entitled "Exclusive means of review," states in pertinent part that "a petition for review filed with the appropriate court of appeals in accordance with this section *shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter*" (emphasis added). According to the Government's position and this Court's June 18th decision, a petitioner's request for a stay of removal must be made to the immigration courts and can only be reviewed by a court of appeals, and only then after the BIA has made a decision on the merits of the claim. Under the Suspension Clause of the Constitution, Congress may substitute for the Habeas Corpus process with other forms of judicial review if the

substitute procedures are "adequate and effective" and essentially equivalent to habeas

protections. *Boumediene v. Bush*, 2008 WL 2369628, 42 (2008). Limiting all judicial

review of claims made by aliens to the Courts of Appeals does not create an "adequate

and effective" substitute procedure if this results in precluding any form of judicial

review over reasonable legal claims.

62.    The Petition for Review process differs from Habeas Corpus review in two

significant ways. First, in Petitions for Review the Courts of Appeal may only consider

the administrative record and may not conduct additional fact-finding or deal with issues

not covered in the record of the immigration court proceedings. Second, Petitions for

Review can only be filed after the exhaustion of administrative proceedings and thus

cannot address emergency situations such as the Petitioner's imminent deportation.

These factors not only render the Petition for Review Process an inadequate substitute for

Habeas Corpus, they also undermine the very purpose of the Great Writ where issues or

claims arising outside of the immigration court record are involved, since only these can

be dealt with in the Petition for Review process.

> **a.    The Petition for Review Process is a Much Narrower Form of Review
> than Habeas Corpus Because it Relies Solely on the Administrative
> Record Without Providing for the Introduction of New Evidence, or
> Permitting Review of Issues not Covered in the Immigration
> Proceedings Below.**

63.    Unlike District Courts in Habeas proceedings, Circuit Courts cannot conduct

additional fact finding when reviewing a case. Federal District Courts in habeas

proceedings, on the other hand, can conduct *de novo* fact-finding when necessary,

allowing the addition of new evidence not in the original record. *See* Habeas Corpus

Rule 6(a); *see also Jean v. Nelson*, 472 U.S. 846, 856-57 (1985); *Morczak v. Greene*, 971

F.2d 510, 518-19 (1992); *Johns v. Dept. of Justice*, 635 F.2d 884, 896 (1981).  This

ability proves especially important when the administrative record is deficient, such as

when a Constitutional claim requires additional fact-finding, or when new issues emerge

that were not considered by the immigration courts, as is true in the present case.  *See*

*Bracy v. Gramley*, 520 U.S. 899, 901 (1997); *Harris v. Nelson*, 394 U.S. 286, 289-90

(1969); *Townsend v. Sain*, 372 U.S. 293, 312 (1963).

64.     The Supreme Court recently elaborated on the importance of the ability to present

new evidence in determining whether a substitute for Habeas Corpus was adequate and

effective.  In *Boumediene v. Bush,* the Court determined that the procedures afforded

under the Detainee Treatment Act (DTA) and the Military Commissions Act (MCA)

were not adequate, effective substitutes for Habeas Corpus on their face, in part because

of the inability of the detainees to present evidence on their own behalf, and other core

differences between the standards applied under the DTA and MCA substitute procedures

and those available under habeas.  *See Boumediene v. Bush*, 2008 WL 2369628 (2008).

The Court pointed out that in other instances where Congress lawfully substituted

alternative procedures for Habeas Corpus, it granted the reviewing courts "broad

remedial powers" including the power to "make findings of fact."  *Id.* at 34.  Historically,

the ability of habeas petitioners to present new evidence in support of their claims was an

important part of the overall procedure.  *Id.* at 36.  When the reviewing court under the

substitute procedures does not have the power to accept or consider additional evidence

or to deal at all with newly emerging issues not covered by the proceedings below, the

substitute procedure cannot be considered an "adequate and effective" alternative, and

therefore raises Suspension Clause concerns. *Id.* at 40, 42. Thus, §1252(a)(5) allows for an unconstitutional suspension of writ.

65.  Immigration judges and the BIA steadfastly maintain that they do not have jurisdiction over constitutional claims and are obliged to apply the law and regulations as written, irrespective of any potential shortcomings. Many crucial facts regarding due process rights violations may not be entered into the record of a deportation hearing, especially where, as in the present case, many of these issues were associated with and raised by detention practices (the ISAP supervised parole program), and the decision to deport the Petitioner despite the pendancy of administrative proceedings, that took place after the deportation proceedings ended. During a habeas review a District Court can take new evidence in order to effectively evaluate any legal or constitutional claims raised by the petitioner, and can make up for deficiencies in the administrative record. The Circuit Courts in the Petition for Review process do not have the discretion to engage in such fact-finding efforts, or to deal with detention and other matters not covered in the immigration court proceedings. Without an opportunity to add directly relevant facts to the record, facts that usually would be entirely absent from the record of administrative proceedings that a Court of Appeals can consider in the Petition for Review process, a petitioner with a valid constitutional or legal claim could have no chance to have his/her claim reviewed on the merits in the Petition for Review process, meaning that the alternative form of judicial review provided under REAL ID is not an adequate, effective, or equivalent substitute for habeas.

> **b.  Holding that REAL ID Precludes Review by Any Court of the
> Legality of Petitioner's Deportation Until the Conclusion of His
> Motion to Reopen Proceedings Violates the Key Principle of Habeas
> Corpus to Stop the Government from Committing an Arbitrary Act
> in Violation of the Constitution.**

66.    Even more indicative of the limits and inadequacies of the Petition for Review

process in the present case is that the Government and the Court have acknowledged that

it cannot address Constitutional violations on an emergency basis, which is one of the key

purposes of Habeas Corpus review.  8 U.S.C. §1252(b)(9) provides that:

> Judicial review of all questions of law and fact, including interpretation and
> application      of constitutional and statutory provisions, arising from any action taken or
> proceeding      brought to remove and alien from the United States under this subchapter
> shall be      available only in judicial review of a final order under this section.

If this provision is interpreted to preclude habeas review of the Petitioner's claims it

would undermine the purposes of habeas review and raise substantial Suspension Clause

concerns.

67.    The Supreme Court has repeatedly stated that Habeas Corpus exists to provide a

speedy review of the legality of Government action in order to prevent imminent abuses.

*See Carafas v. LaVallee*, 391 U.S. 234, 238, 88 S.Ct. 1556, 1560 (1968) ([the writ's]

province, shaped to guarantee the most fundamental of all rights, is to provide an

effective and speedy instrument by which judicial inquiry may be had into the legality of

the detention of a person); *Harris v. Nelson*, 394 U.S. 286, 291, 89 S.Ct. 1082,

1086 (1969) (office of the writ is "to provide a prompt and efficacious remedy for

whatever society deems to be intolerable restraints") (internal citations omitted).

68.    The reason for this emphasis on a speedy resolution of the claims raised in habeas

proceedings is because the writ serves to prevent the Government from violating

fundamental Due Process liberty interests.  According to the Supreme Court, "[t]he writ

of habeas corpus has played a great role in the history of human freedom. It has been the judicial method of lifting undue restraints upon personal liberty." *Price v. Johnston*, 334 U.S. 266, 269, 68 S.Ct. 1049, 1052 (1948) *overruled on other grounds by McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454 (1991).

69.     The ability to challenge unlawful Government activity is meaningless if a Petitioner cannot actually have a court review the challenged activity until after it has been carried out and irreparable damage has occurred.  The Petitioner in this case sought review of the Government's arbitrary decision to deport him based on an irrational application of the ISAP supervision program that forced him into non-compliance, and was used to justify a speedy deportation while his Motion to Reopen his asylum and Convention Against Torture claim was pending.  If the Petitioner must wait until the Motion to Reopen has been denied in order for a federal court to determine whether his deportation should have been stayed during the pendency of that motion, then the only judicial remedy available to him, namely the Petition for Review process under REAL ID, is absolutely meaningless because it cannot under any circumstances be used to address a situation of arbitrary detention and deportation.  By the time the Fourth Circuit is able to review the BIA's decision on the merits a deprivation of liberty will have already occurred in the most severe of ways: Petitioner will have already been deported to a situation of torture. Thus, the "alternative" process for review is inadequate on its face, as the Supreme Court found in the *Boumediene* case.

70.     An adequate substitute for Habeas Corpus must do more than merely provide a pro forma appeal of underlying proceedings.  As the Supreme Court recently stated, "Habeas corpus is a collateral process that exists, in Justice Holmes' words, to "cu[t] through all forms and g[o] to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell."

*Boumediene,* 2008 WL 2369628 at 39 (internal citations omitted). Habeas Corpus provides individuals with a means to have unlawful Government action reviewed promptly, while the challenged deprivation of liberty can still be reversed and remedied. Replacing Habeas Corpus with a substitute than cannot be employed on an emergency basis but is merely a form of direct appeal of administrative proceedings constitutes an unconstitutional elimination of Habeas Corpus remedies without providing an adequate and effective substitute.

71.     These same deficiencies would apply, and would be further exacerbated, if this Court once again applies the habeas jurisdiction provisions of REAL ID to preclude habeas review of the merits of Petitioner's Due Process claims.

> **c. Denying a Court Jurisdiction to Hear a Case Involving an Improper and Unlawful Deportation Violates the Constitution.**

72.     The Supreme Court in *Boumediene* declared the DTA unconstitutional under reasoning that can largely be applied to the analysis of the constitutionality of the habeas stripping provisions of REAL ID. In *Boumediene* the Supreme Court found that the judicial review procedures provided as a substitute for habeas constituted an inadequate replacement for the review the detainee would be afforded via habeas corpus. Namely, the Court cited a number of rights and protections provided for under habeas that were not available through the procedures set out in the DTA and MCA. *Boumediene v. Bush*, 2008 WL 2369628 at 43.

73.     The analysis used by the Court in *Boumediene* can also be applied to REAL ID as it pertains to the availability of adequate judicial remedies under the Petition for Review process when compared to the habeas process. If the Petitioner is denied access to any form of judicial review to deal with the issues he seeks to raise in his habeas petition,

31

serious Suspension Clause concerns would be raised.  Such is the case here because the

Petition for Review process cannot cover the Constitutional issues arising after the

deportation proceedings were completed.  As a result, if the REAL ID jurisdiction

stripping provisions are deemed applicable, Petitioner will be left without a means to

receive judicial review of wholly unreasonable and arbitrary Executive action separate

and independent of the issues covered in his deportation proceedings in the immigration

court.

    **2.   Petitioner's Deportation Will Not Moot His Petition for Habeas Corpus Filed Prior to that Deportation.**

74.    The Petitioner's habeas petition will not be rendered moot by his deportation,

when and if it takes place.  The habeas statute generally is geared to deal with situations

where a petitioner is in custody at the time the petition was filed.  *See Spencer v. Kemna,*

523 U.S. 1, 7, 118 S.Ct. 978, 978 (1998).  Deportation of a habeas petitioner subsequent

to the petition's filing does not automatically terminate the court's jurisdiction or render

the claim moot.  *Zalawadia v. Ashcroft,* 371 F.3d 292, 296-98 (5th Cir.2004).  *See also*

*Abdala v. INS,* 488 F.3d 1061, 1063-64 (9th Cir. 2007); *Zegarra-Gomez v. INS,* 314 F.3d

1124, 1126-27 (9th Cir.2003); *U.S. v. Garcia-Echaverria*, 374 F.3d 440, 450 (6th Cir.

2004).  When a deported habeas petitioner still suffers collateral consequences of that

deportation, jurisdiction over the petition remains, since the deportation has continuing

and ongoing effects that prolong the custody status.  *Handa v. Clark*, 401 F.3d 1129,

1132 (9th Cir. 2005).  The 10 year period of inadmissibility that attaches to a removed

alien under 8 U.S.C. § 1182(a)(9)(A)(ii) is enough of a collateral harm to satisfy the "case

or controversy" requirement for federal claims and maintain the viability of the habeas

petition.  *See Id; Zegarra-Gomez,* 314 F.3d at 1126.  Furthermore, given that Petitioner

faces a likelihood of torture in Cameroon, precisely the issue raised in his Motion to

Reopen before the BIA, and given that protection under the Convention Against Torture

is a mandatory form of relief for those aliens who can show a likelihood of torture, the

severe deprivation of liberty that deportation would represent would justify the Court's

continued consideration of the habeas petition, and the Court's ordering the Petitioner

returned to the United States.

75.    The Petitioner was in custody at the time his petition was filed.  Not only was he

detained in a detention facility, the final order of removal against him meant he was "in

custody" for habeas purposes.  *See Simmonds v. INS,* 326 F.3d 351, 354 (2d Cir.2003);

*Aguilera v. Kirkpatrick,* 241 F.3d 1286, 1291 (10th Cir.2001); *Mustata v. U.S. Dep't of*

*Justice,* 179 F.3d 1017, 1021 n. 4 (6th Cir.1999); *Nakaranurack v. United States,* 68 F.3d

290, 293 (9th Cir.1995); *Rosales v. ICE,* 426 F.3d 733, 735 (5th Cir. 2005).  Since he was

in custody at the time the petition was filed, his deportation does not nullify his ability to

pursue a habeas petition.

76.    Deportation itself can represent a "serious deprivation of life, liberty, or property"

of the type that habeas review is designed to address and prevent.  *See Haitian Refugee*

*Center v. Civiletti*, 503 F.Supp. 442, 455 (D.C. Fla. 1980).  The Supreme Court has noted

that deportation can cause "drastic deprivations, " *Woodby v. INS*, 385 U.S. 276, 285, 87

S.Ct. 483, 487-88 (1966), and may result in "loss of both property and life, or of all that

makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).  *See also*

*Reno v. Flores*, 507 U.S. 292, 306 (1993); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945).

This is especially true where the alien has a pending Motion to Reopen his case.  *Patel v.*

*Ashcroft*, 378 F.3d 610, 612 (7th Cir. 2004); *Castaneda-Suarez v. INS*, 993 F.2d 142,

145-46 (7th Cir. 1993); *Gutierrez-Rogue v. INS*, 293 U.S. App. D.C. 338, 954 F.2d 769, 773 (D.C. Cir. 1992).

77.    The issues raised in Petitioner's habeas petition have not been rendered moot by his deportation because Petitioner still has an interest in the outcome of the habeas proceedings.  Not only does Petitioner face a 10 year bar to re-admission into the United States, a severe penalty considering his wife and child live in this country, he also still faces the threat of persecution and torture that formed the basis for the Motion to Reopen. If either Petitioner's deportation during the pendency of his Motion to Reopen, or the arbitrary and irrational supervision requirements that led to his being put in a speedy deportation process, were held to be unlawful as a result of the habeas proceedings, the Court could order his return to the United States to allow him to pursue his pending claim for refugee protection.  For these reasons Petitioner still has a significant interest in the results of his habeas proceedings that justify the Court's continued exercise of jurisdiction over the merits of his habeas claims.

**B.  ICE'S DEPORTATION OF PETITIONER BEFORE HIS MOTION TO REOPEN HAS BEEN ADJUDICATED IS A VIOLATION OF DUE PROCESS AND OF THE CONVENTION AGAINST TORTURE**

78.    Deporting Petitioner before the BIA adjudicates his pending Motion to Reopen would violate the Convention Against Torture and its implementing legislation, as well as Petitioner's right to Due Process.  Under the law, Petitioner is entitled to file a Motion to Reopen based on changed circumstances in his country that materially impact on the likelihood of his being subjected to torture.  8 C.F.R. § 1003.2(c)(3)(ii).  He is entitled to a determination of his rights under that Motion by the BIA before any adverse action, such as deportation, is taken.

79.    Aliens in the United States are entitled to Due Process, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001).  *See also Plyler v. Doe*, 457 U.S. 202, 210 (1982) (Aliens in the U.S. under final orders of removal are 'persons' for the purposes of the Due Process Clause"). Under certain circumstances deportation can represent a significant deprivation of Due Process liberty interests.  *Reno v. Flores*, 507 U.S. 292, 306 (1993).  Deportation "may result also in loss of both property and life, or of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).  The Supreme Court has described deportation as an action that "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945).  The Court went on to state that "[m]eticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness."  *Id.*  Deporting an alien without allowing him the opportunity to have valid legal claims adjudicated severely infringes on his liberty interests and on his right to have his claims heard and adjudicated on a reasonable basis.  *See Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442 (D.C. Fla 1980).

80.    Removing Petitioner at this stage, while legal proceedings are pending, deprives him of his right to have his Motion adjudicated and his right to any relief that the BIA may find appropriate.  Once Petitioner is deported, even if the BIA found his Motion meritorious, there is no certainty that Petitioner could be found and returned to the United States, and in any case he would be placed in a situation where he likely would be subjected to torture before being found and returned to the United States.  The right to file a Motion to Reopen is meaningless without the right to remain in the United States

while the motion is adjudicated, and to actually receive the benefit of any relief granted

by the Immigration Courts.  This is particularly true when the relief Petitioner is seeking

is protection from torture.  The efficacy of the BIA procedures available to Petitioner, and

his right to due process adjudication of his legal claims, is significantly undermined, and

he is placed in a situation where his physical well-being and personal rights and interests

would be negatively impacted without Due Process protections being observed..

81.     Deporting Petitioner during the pendency of the Motion to Reopen also violates §

2242 of The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), the

implementing statute of the Convention Against Torture, and violates Article VI of the

Constitution establishing the treaties and laws of the U.S. as the supreme law of the land.

The Convention Against Torture provides that State parties must not, under any

circumstances or for any reason, return aliens to countries where it is more likely than not

they will be tortured.  United Nations Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment 1465 U.N.T.S. 85, G.A. Res. 39/46, 39

U.N. GAOR Supp. No. 50, Art. 3, U.N. Doc. A/39/51 (1984).  The prohibition against

return to torture is absolute.  Article III of CAT states that "no State party shall expel,

return ("*refouler*") or extradite a person to another State where there are substantial

grounds for believing that he would be in danger of being subjected to torture."  The

United States ratified the treaty in October 1994, making no reservations to Article 3.  S.

Rep. 102-30 (Apr. 9, 1991).  Congress passed § 2242 of FARRA to fully implement

Article 3 in the same unconditional terms found in the treaty itself.  An alien in the

United States cannot be returned to a country if he can show it is more likely than not he

will be tortured there.  The Petitioner has a claim pending to that effect before the BIA in

the form of a Motion to Reopen.  This Motion notes, among other facts, the recent arrest

of his brother in Cameroon for his political activities.  His deportation before these

pending claims can be adjudicated would, on their face, be inconsistent with the

requirements of the Convention Against Torture, FARRA and Article VI of the

Constitution.

82.    Significant political changes and resulting violence in Cameroon have provided

new circumstances and information highly relevant to Petitioner's claim that it is more

likely than not he will be tortured if returned to Cameroon.  Petitioner is entitled to

present this new information in the form of a Motion to Reopen.  Given the absolute

nature of the prohibition on return to torture, the U.S. government has an obligation to

refrain from deporting the Petitioner to Cameroon before the BIA can consider whether

there are substantial grounds to believe he will be tortured in light of changed conditions

in that country.

### C. THE SUPERVISION REQUIREMENTS IMPOSED ON PETITIONER BY ISAP WERE ARBITRARY AND IRRATIONAL AND CANNOT PROVIDE A LAWFUL BASIS TO JUSTIFY PETITIONER'S IMMEDIATE DEPORTATION

83.    Petitioner faces deportation, or has already been deported, as a direct result of an

additional violation of his Due Process rights.  The supervision requirements imposed by

ISAP officials operating under the supervision and control of the Respondent, mandating

daily in person reporting when this was economically and physically impossible, were

unjustifiably arbitrary and placed Petitioner in a position of being unable to comply.

Despite having no criminal record, strong family ties, and having been in compliance

with supervision for several months, Petitioner's supervision requirements were

arbitrarily changed one year ago so that he had to wear an ankle monitor and report to ISAP five days a week.

84.    Reporting to ISAP involved a roundtrip commute of several hours. This daily commute would be expensive for anyone, but ISAP officials were aware that Petitioner had no work authorization and that his wife was supporting the entire family and could not work full time because of illness. Even after Petitioner informed his case managers that his wife had developed a debilitating illness that left her unable to work full time and that she could barely afford to feed their child, let alone pay for Petitioner's daily trips to Baltimore, ISAP officials refused to alter the supervision requirements. Despite this hardship, Petitioner complied with the excessive supervision requirements for one year, commuting to Baltimore five days a week, bringing his baby son along while his wife worked or was too ill to care for the child.

85.    When Petitioner literally no longer had the funds to pay for gas to commute to Baltimore he informed his case manager over the telephone that he could not come to the ISAP office that day. Petitioner's failure of compliance was not due to a desire to avoid supervision or to disappear. He maintained telephone contact with his case manager in an effort to comply to the fullest extent possible. ISAP imposed impossible supervision requirements on Petitioner, and ICE quickly arrested and detained him when he failed to meet these arbitrary and unreasonable requirements.

86.    Petitioner would not have been placed in this position of being deported during the pendency of his Motion to Reopen but for the arbitrary, unlawful and irrational requirements imposed under the ISAP program by the Respondent. His Due Process rights and ability to have his claims heard, as well as the protection of his rights under

Article 3 of the Convention Against Torture and § 2242 of FARRA, are violated because Petitioner was put in a position of being unable to comply with his supervision order. He was subjected to arrest and immediate deportation as a result of arbitrary and irrational supervision requirements. In Petitioner's case the ISAP program has served as a system to facilitate the arrest and deportation of aliens rather than a system to monitor the status of aliens and ensure their presence. Arbitrary and impossible requirements imposed on aliens under Orders of Supervision cannot be used to justify denial of their Due Process rights to have their claims heard by the Immigration Courts. Such a practice certainly cannot be used to circumvent the United States' obligations under FARRA and the Convention Against Torture.

### D. THIS COURT SHOULD MAINTAIN ITS JURISDICTION OVER THIS CASE EVEN IF THE PETITIONER'S ADMINISTRATIVE PROCEEDINGS ARE PROPERLY CONCLUDED AND/OR HE IS DEPORTED

87.    Petitioner notes that this Habeas Petition remains valid and relevant and does not become moot, even if the BIA considers and makes a decision on his Motion to Reopen. That decision, of course, remains subject to appeal to the U.S. Court of Appeals under the Petition for Review process. But even apart from those continuing appellate proceedings, it is important to recognize that the Petitioner's deportation and the conclusion of his administrative proceedings do not eliminate the fact that arbitrary, unlawful and unconstitutional actions were taken against him. Even if Petitioner is deported and even if his administrative proceedings are completed, this Court must maintain its jurisdiction to consider and deal with the unlawful and unconstitutional actions taken against the Petitioner, and to frame the appropriate relief to address these violations. Petitioner cannot raise these issues, arising from actions taken outside of the administrative

proceedings, before the Fourth Circuit in a Petition to Review the BIA's decision on the Motion to Reopen.

88.    A decision by the BIA would not resolve or moot the issues Petitioner has raised in this Petition.  The Due Process violations that occurred as part of the application of the ISAP program to the Petitioner are wholly separate from the issue of Petitioner's Due Process right to be present in the United States during pendency of his Motion to Reopen. Additionally, the issue of whether the REAL ID Act's substitution of the Petition of Review process for habeas review is facially inadequate and in violation of the Suspension Clause is also a separate issue that the Court can still resolve despite a BIA decision denying or granting the Motion to Reopen being made prior to this Court's decision.  Finally, the Court can still resolve the question of whether deportation of the Petitioner during pendency of his Motion to Reopen would have violated Due Process even if the BIA makes a decision in the meantime.  All of these issues involve core fundamental rights under the Constitution, such as the right to habeas review, that cannot be sidestepped or mooted out by the resolution of the Petitioner's other administrative claims.  For this reason, the Court should maintain jurisdiction over this habeas petition and provide declaratory judgments on these issues, even if the BIA makes a decision on the Motion to Reopen prior to this Court's decision on the merits of the Habeas Petition.

## RELIEF REQUESTED

WHEREFORE, for all of the reasons stated above, Petitioner, Jean Marc Nken, prays this Honorable Court to issue a Writ of Habeas Corpus in his favor and to grant the following:

1. A declaratory judgment that the Intensive Supervision and Appearance Program was used improperly in violation of Due Process, causing Petitioner's non-compliance status that resulted in the Respondent's decision to deport him;

2. A declaratory judgment that the alternative form of judicial review provided by the REAL ID Act as a substitute for habeas corpus is deficient on its face as the Supreme Court held with regard to the Detainee Treatment Act and Military Commissions Act in *Boumediene v. Bush*, insofar as the alternative form of judicial review authorized by REAL ID does not and cannot properly consider the legal and Constitutional claims the Petitioner has raised, separate and independent from matters covered by the deportation proceedings before the immigration courts, and the record of those proceedings;

3. A permanent injunction against the United States and all of its officers, agents and service, prohibiting the Government from deporting the Petitioner during the pendency of his Motion to Reopen, or, in the alternative if he has already been deported, a mandatory injunction securing the Petitioner's immediate return to the United States;

4. A mandatory order that Petitioner be released from detention and reinstated into a valid and reasonable supervision program; as well as,

5. Such other relief as the Court deems appropriate under the circumstances of this case.

Respectfully submitted this 27th day of June, 2008 by:


_____/s/_____
Morton Sklar (DC Bar # 144139)
Executive Director
and
Lynsay Gott
Equal Justice Works Fellow and
Refugee Project Associate
World Organization for Human Rights USA
2029 P Street NW, Suite 301
Washington, DC  20036
Ph: 202-296-5702
Fax: 202-296-5704
msklar@humanrightsusa.org
lgott@humanrightsusa.org
*Counsel for the Petitioner*

with the assistance of

Julie Larson
Kansas University School of Law,
Avani Patel
University of Georgia School of Law,
Tara Rucker
American University Washington College of Law,
and
Jessica Trinh
University of Maryland School of Law
*Legal Interns*

**Petitioner's Verification of the Truthfulness of
the Petition for Habeas Corpus**

I, Jean Marc Nken, hereby affirm, under penalty of perjury, that the factual assertions contained
in this Petition for Habeas Corpus are true and correct to the best of my knowledge.

_____          _____6|19|08_____
Jean Marc Nken                                        date

43

**United States District Court**
**for the District of Columbia**

**Jean Marc Nken**
**A# 95223548**
**Howard County Detention Center**
**7301 Waterloo Road**
**Jessup, MD 20794**

| | | |
|---|---|---|
| **Jean Marc Nken,** | ) | |
|     **Petitioner,** | ) | **Case No. 08-c-v-1010** |
| **(CKK)** | | |
| | ) | |
| **v.** | ) | **Petition for** |
| | ) | **Habeas Corpus** |
| **Michael Chertoff, Secretary of** | ) | |
| **Department of Homeland Security,** | ) | |
|     **Respondent** | ) | |

**PROPOSED ORDER**

Based on the Habeas Corpus Petition filed by the Petitioner, the Court HEREBY
DECLARES the following:

1. Petitioner's Due Process rights are infringed if he is deported while

   administrative proceedings in his case are pending;

2. The Intensive Supervision and Appearance Program (ISAP) was used

   improperly in the Petitioner's case in violation of Due Process, arbitrarily and

   unfairly causing Petitioner's non-compliance status that resulted in his imminent

   deportation; and

3. The REAL ID Act's replacement of habeas corpus with the Petition for Review

   Process is inadequate and ineffective on its face and is in violation of the

   Suspension Clause of the Constitution insofar as it restricts access to habeas to

consider issues independent of those raised in the deportation proceedings in the

immigration courts, or arising subsequent to those proceedings.

The Court HEREBY ORDERS the following:

1. A permanent injunction is issued against the United States and all of its officers,

   agents and service, prohibiting the Government from deporting the Petitioner

   during the pendency of his Motion to Reopen, or, in the alternative if he has

   already been deported, a mandatory injunction is issued securing the Petitioner's

   immediate return to the United States so that he is present while his Motion to

   Reopen is pending; and,

2. The Petitioner shall be released from detention and reinstated into a supervision

   program under terms that are reasonable under the circumstances of his case.


Date:_____                    _____
                                              Colleen Kollar-Kotelly
                                              United States District Judge

## CERTIFICATE OF SERVICE

This is to certify, under penalty of perjury, that a true and complete copy of

Petitioner's First Amended Petition for Habeas Corpus was served by U.S. Postal

Service, by email and through the Court's electronic posting system on this date on the

Respondent through his counsel at the addresses below:


Gregory G. Katsas
Acting Assistant Attorney General,
Elizabeth J. Stevens
Assistant Director,
Kathryn L. Moore
Trial Attorney
U. S. DEPARTMENT OF JUSTICE
Office of Immigration Litigation
Ben Franklin Station
P. O. Box 878
Washington, DC 20044
Elizabeth.stevens@usdoj.gov


Signed and certified to this 27th day of June, 2008 by:


\_\_\_\_\_/s/_____
Lynsay Gott
Equal Justice Works Fellow and
Refugee Project Associate
Human Rights USA

## List of Attachments

| | | |
|---|---|---|
| 1. | **Affidavit of Lynsay Gott** | **Attachment A** |
| 2. | **Affidavit of Julie Larson** | **Attachment B** |
| 3. | **Motion to Reopen Based on Changed Country Conditions** | **Attachment C** |
| 4. | **Approval Notice for I-130 Petition for Relative Visa** | **Attachment D** |
| 5. | **Decision of the Fourth Circuit Court of Appeals** | **Attachment E** |
| 6. | **Decision of the Board of Immigration Appeals** | **Attachment F** |

Attachment A

Affidavit of Lynsay Gott

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In Re | \* |
| | \* |
| Jean Marc Nken | \*   AFFIDAVIT OF LYNSAY GOTT |
| | \*   in Connection with Petition for Habeas Corpus |
| A# 95223548 | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**AFFIDAVIT**

1.   I, Lynsay Gott, swear and affirm that I am attorney in good standing with the Maryland Court of Appeals.  I work with Morton Sklar (DC Bar # 144139) at the World Organization for Human Rights USA in Washington, DC as an Equal Justice Works Fellow dealing with refugee cases.

2.   The facts presented in this habeas petition were related to me by the Petitioner, Jean Marc Nken, and his immigration attorney, Ronald Richey.

3.   I first spoke to Mr. Nken and his attorney in November of 2007.  Mr. Nken explained his situation, including his daily reporting requirement under ISAP.  At the time I was compiling information on abuses of authority by Immigration and Customs Enforcement regarding aliens in supervision programs.

4.   Mr. Nken contacted me on May 13, 2008 when he no longer had the funds to commute to Baltimore.  He told me that he had reported to his ISAP case manager over the phone, and that the case manager told him to continue to report telephonically.

5.   Despite the ISAP case manager's assurances to Mr. Nken, on May 22, 2008 Mr. Nken told me that his case manager informed him he had been removed from the program and that ICE officials were looking for him to arrest and deport him.

6.   Mr. Nken called my office on May 30, 2008 after his arrest by ICE officials.  On June 2, 2008 I visited Mr. Nken at the Howard County Detention Center where he retained me and Mr. Sklar as counsel.  I then spoke with the ICE official in possession of Mr. Nken's file, Diona Ellis, at ICE offices in Baltimore.  Ms. Ellis informed me that ICE was actively seeking to deport Mr. Nken as soon as possible.  She said that they were in the process of arranging Mr. Nken's travel documents, and since ICE was already in custody of Mr. Nken's passport that process would be completed quickly.  Ms. Ellis also informed me that Mr. Nken had been arrested and was now facing deportation because of his alleged violation of his ISAP supervision requirements.

7.    Mr. Nken called me at my office on the afternoon of June 11, 2008 to say that he had been contacted by an ICE official, Crystal Porter, who told him that ICE had acquired all of the necessary travel documents, including a plane ticket to Cameroon, and that he would be deported on June 16 or 17. According to Mr. Nken, Ms. Porter told him that he was being deported as a direct result of violating his ISAP supervision requirements

Lynsay Gott
Equal Justice Works Fellow and
Refugee Project Associate
World Organization for Human Rights USA
2029 P Street NW, Suite 301
Washington, DC 20036

State of District of Columbia

County of _____

The foregoing instrument was acknowledged before me by Lynsay Gott, this 12th day of June, 2008.

Theona Prince
Notary Public, District of Columbia
My Commission Expires 2-28-2010

Witness my hand and official seal.

_____
Notary Public

My commission expires: _____

**Attachment B**

**Affidavit of Julie Larson**

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

*******************************************************************************

| | | |
|---|---|---|
| IN RE | * | |
| | * | |
| JEAN MARC NKEN | * | AFFIDAVIT OF JULIE LARSON |
| | * | in connection with |
| A#: 95223548 | * | Petition for Habeas Corpus |

*******************************************************************************

### AFFIDAVIT

I, Julie Larson, swear and affirm that I am working as a summer intern at the World Organization for Human Rights USA, and I am a third year law student at the University of Kansas Law School. Jean Marc Nken, a national and citizen of Cameroon, made a collect call to our office at approximately 11:15 a.m. on Wednesday, June 11, 2008. I was in the office and working on the case when his call was received. In that call he told us that just five minutes earlier that morning, Immigration Officer Crystal Porter informed him that travel arrangements for his deportation had been completed and that he would be deported to Cameroon on a flight on either Monday or Tuesday, June 16 or 17. Ms. Porter told Mr. Nken that her supervisor Mr. Boekana (spelling unclear) had informed her that the Petitioner had violated the reporting terms of the Intensive Supervision Appearance Program ("ISAP") and that these problems with ISAP were the basis for his recent arrest and detention by ICE, and for his imminent deportation.

I declare that the foregoing is true and correct to the best of my knowledge.

Signed and sworn to before a Notary on this 12th day of June 2008 in Washington DC by:

Julie Larson
Human Rights USA
2020 P Street NW, Suite 301
Washington, DC 20036
Tele: (202) 296 – 5702
Fax: (202) 296 – 5704
info@humanrightsusa.org
*Legal Intern*

Subscribed and sworn to me by Julie Larson on this 12th day of June 2008, to certify which witness my hand and seal of office.

NOTARY PUBLIC

Theona Prince
Notary Public, District of Columbia
My Commission Expires 2-28-2010

My commission expires: _____

Attachment C

Motion to Reopen Based on Changed Country Conditions

Ronald D. Richey, Esquire
Attorney for Jean Marc NKEN
966 Hungerford Drive, Suite 8-A
Rockville, MD 20850
(301) 738-6909

NON-DETAINED RESPONDENT

MAY 0 6 2008

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE OF IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
Falls Church, Virginia

```
                                    )
                                    )
In the matter of                    )
                                    )
                                    )
                                    )
                                    )
Jean Marc NKEN                      )      File No.:    A95-223-548
                                    )
                                    )
                                    )
                                    )
                                    )
IN REMOVAL PROCEEDINGS              )
                                    )
                                    )
```

RESPONDENT'S MOTION TO REOPEN (AND REMAND)
BASED ON RECENTLY CHANGED COUNTRY CONDITIONS AND NEW EVIDENCE
NOT PREVIOUSLY AVAILABLE

Respondent. Jean Marc NKEN. by and through counsel. Ronald D. Richey. hereby moves this Honorable Board of Immigration Appeals (hereinafter "Board") to reopen (and remand) removal proceedings. due to recent change in country conditions and new evidence not previously available. and for cause states:

### Brief Summary of Relevant Facts and Procedural History

Respondent Jean Marc NKEN is a national of Cameroon. He is married to an U.S. Citizen and they have a minor U.S. Citizen child.

On April 23. 2003. the Immigration Court issued an written opinion in which it denied Respondent NKEN's applications for political asylum. withholding of removal pursuant to INA §241(b) (3) and protection pursuant to the UNCAT. Respondent NKEN's asylum case is based primarily on his political opposition activities and his political opinions against the dictatorship in Cameroon.

On or about May 16. 2003. Respondent NKEN. through counsel. filed a timely appeal. and. subsequently. a supporting brief with this Honorable Board seeking review of the Immigration Court's denial of his claims of relief.

On August 12. 2004. this Honorable Board remanded Respondent's NKEN's proceedings to the Immigration Court for a specific adverse credibility finding.

On March 4. 2005. the Immigration Judge. without taking any testimony and/or holding a new evidentiary hearing. denied Respondent NKEN's applications for asylum. withholding of removal and protection under the UNCAT. and made an adverse credibility finding.

On March 31. 2005. Respondent NKEN filed a timely appeal of the Immigration Court's decision and. subsequently. submitted a motion to remand his case to the Immigration Court so

that he could apply for adjustment of status based on a pending immigrant relative (I-130) petition filed on his behalf by his U.S. Citizen spouse, Brigitte Beloeck.[1]

On June 16, 2006, this Honorable Board adopted and affirmed the decision of the Immigration Court. Recently, the President of Cameroon for over twenty-five years, Paul Biya, announced that he would change the constitution to permit himself to be a dictator for life. This resulted in major demonstration against the government throughout Cameroon. The repressive government, however, quickly quashed the protests and began rounding up any militants or suspects, including Respondent's brother. (See attached documentation, Exhibits BB, CC and DD.)

## ARGUMENT

This motion to reopen should be granted pursuant to INA §240(c)(7) and 8 C.F.R. §1003.2. The motion "shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." INA §240(c)(7)(B). "A motion to reopen shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. §1003.2(c)(1).

The present motion is not barred by time and/or numerical limitations, because it is based on **changed county conditions**.

In addition, the new evidence that Respondent NKEN offers is material because it impacts on his credibility and claims for relief, which is determinative in his removal proceedings. Moreover, the enclosures provide new factual evidence based on ecent events supporting Respondent's well-founded fear of future persecution if removed to Cameroon.

---

[1] After a long delay, the USCIS approved the I-130 Petition on August 22, 2006. (A copy of the I-130 Approval Notice is attached hereto and made a part hereof as Exhibit AA.)

Further, this offered material evidence was not available at the time of the former hearing(s). Notably, this offered evidence describes recent significant new political events in Cameroon.

Specifically, Respondent NKEN presents herewith three significant diverse sets of documents. First, a detailed original letter (with English translation) from Respondent's younger brother, Lucien Nounga, (and the original envelope). (The letter is attached hereto and made a part hereof as Exhibit BB.) This letter is dated March 18, 2008. The letter describes the recent political unrest in Cameroon caused primarily by President Biya's recent decision to change the constitution of Cameroon to allow him to be president for life, the regime's brutal response, and the recent arrest and detention of Respondent's younger brother. Without a doubt, in any country (especially a so called "democracy" like Cameroon), the changing of the country's constitution to permit the President (of 25 years) to stay in power for life would be considered of such significance to qualify as a change in country conditions. In other words, Paul Biya would do away with elections and the rights of its citizenry to change the government. This would amount to a fundamental change in the government and rights of the citizens of Cameroon. (Our American founding fathers would have found such a tyrannical idea to be totally contrary to the principles of freedom and democracy and reason for revolution.)

Second, Mr. NKEN presents herewith four (4) recent photographs of him and other activists during a political demonstration for "Democracy in Cameroon" in front of the Embassy of Cameroon. (These photographs are attached hereto and made a part hereof as Exhibit CC.) This demonstration was a prompt response to recent arrests, detentions, torture and killings in Cameroon orchestrated by the dictatorial regime of Paul Biya.

Third, Mr. NKEN presents herewith nine recent news-article from the internet regarding

4

the current political situation in Cameroon and showing that the situation in Cameroon is not safe at all and is likely to become worse in the near future since the Biya regime moves to consolidate power and control, including brutal repression of critics like the Respondent. (These news-articles are attached hereto and made a part hereof as Exhibit DD.)

Therefore, this a recent and a subsequent development to this Board's last decision. Further, this evidence is material and significant because, inter alia, it corroborates Respondent's fear of persecution and/or torture by the brutal regime in Cameroon. Specifically, the recent changed country conditions and arrests and killings occurring in Cameroon confirm that the police in Cameroon would likely arrest and torture Respondent NKEN, if he returns to Cameroon. This evidence supports his fear of future persecution and confirms his credibility.

Furthermore, in the interests of justice and fairness, this Honorable Board should reopen (and remand) its prior "Decision and Order" and allow Mr. NKEN to present the offered new evidence, to the immigration court, that is material to his claims of relief. Significantly, this Honorable Board may "take any action consistent with their authorities under the Act and the regulations as is appropriate and necessary for the disposition of the case." 8 C.F.R. §1003.1(d)(ii). Additionally, this Honorable Board has discretionary equitable powers to serve the interests of justice. See generally *Matter of G-D-*, 22 I&N Dec. 1132 (BIA 1999) (stating that as long as the Board has jurisdiction, its "discretionary powers are not limited, restricted, or qualified.")

WHEREFORE, for the foregoing reasons and in the interests of fairness and justice, Respondent NKEN respectfully moves this Honorable Board to grant his claim for political asylum, or remand his removal proceedings back to the immigration court in order that he may be permitted to present new material evidence relating to his meritorious applications for asylum.

withholding of removal and/or protection under the CAT.

Respectfully submitted.

Ronald D. Richey
Attorney for Respondent
966 Hungerford Drive, Suite 8A
Rockville, MD 20850
(301) 738-6909901

6

**Attachment D**

I-130 Petition for Relative Visa Approval Notice

| Receipt Number:<br>EAC-05-034-52155 | | Case Type | I-130, Petition for Alien Relative |

| Recei pt Date | Priority Date: | Petitioner/Applicant: |
| November 17, 2004 | November 17, 2004 | Brigitte Beloeck |

| Notice Date | Page | Beneficiary: | A79 399 273 |
| August 22, 2006 | Page 1 of 1 | Jean Marc Nken |

Notice Type: Approval Notice

Brigitte Beloeck

1836 Metzerott Road Apt 1508

Adelphi, MD  20783

Spouse of an LPR

The above petition/application has been approved.
*(La solicitud o petición arriba mencionada ha sido aprobada).*

The disposition of the petition/application is noted below:   *(La disposición de la petición/solicitud se nota a continuación):*

The approved visa petition/application was sent to the American Consulate in :
*La aprobada petición/solicitud de visa fue enviada al Consulado Norteamericano en:*

All future correspondence relating to that petition or application must be directed to that Consulate.
*Toda la correspondencia futura relacionada a esa petición o solicituddebe ser dirigida al Consulado.*

The approved petition/application was transferred to this CIS office:
*La aprobada petición/solicitud fue transferida a esta oficina de CIS :*

All future correspondence relating to that petition or application must be directed to that Office.
*Toda la correspondencia futura relacionada a esa petición o solicitud debe ser dirigida al esta oficina.*

The approved visa petition was sent to the State Department's National Visa Center
(NVC), 32 Rochester Avenue, Portsmouth, NH  03801-2909
*La aprobada petición de visa fue enviada al Centro Nacional de Visa del Departmento del Estado
(NVC), localizado en 32 Rochester Avenue, Portsmouth, NH 03801-2909.*

All future correspondence relating to that petition or application must be directed to the NVC..
*Toda la correspondencia futura relacionada a esa petición o solicitud debe ser dirigida al NVC.*

✓  The approved visa petition or application is has been retained by this office.
*La aprobada petición/solicitud ha sido retenida por esta oficina de CIS :*

cc:   Juan Washington

2730 University Blvd. West, Ste 500

Wheaton MD   20902-1975

Please see additional information on the back.  You will be notified separatately about any other cases you filed.

**U.S. Citizenship and Immigration Services**
BALTIMORE DISTRICT OFFICE
31 HOPKINS PLAZA, FALLON FEDERAL BUILDING
BALTIMORE, MARYLAND 21201

Customer Service Telephone  1-800-375-5283

Attachment E

Decision of the Fourth Circuit Court of Appeals

Westlaw

227 Fed.Appx. 265　　　　　FOR EDUCATIONAL USE ONLY　　　　　Page 1
227 Fed.Appx. 265, 2007 WL 1037391 (C.A.4)
**(Cite as: 227 Fed.Appx. 265, 2007 WL 1037391 (C.A.4))**

Nken v. Gonzales
C.A.4,2007.
This case was not selected for publication in the
Federal Reporter.Not for Publication in West's
Federal Reporter See Fed. Rule of Appellate
Procedure 32.1 generally governing citation of
judicial decisions issued on or after Jan. 1, 2007.
See also Fourth Circuit Rule 32.1 (Find CTA4 Rule
32.1)

United States Court of Appeals,Fourth Circuit.
Jean Marc NKEN, Petitioner,
v.
Alberto R. GONZALES, U.S. Attorney General,
Respondent.
No. 06-1784.

Submitted: Feb. 21, 2007.
Decided: April 3, 2007.

**Background:** Alien filed petition for review of order
of Board of Immigration Appeals (BIA) that
dismissed appeal from immigration judge's denial of
application for asylum, for withholding of removal,
and for relief under Convention Against Torture
(CAT).

**Holding:** The Court of Appeals held that BIA's
denial of alien's motion to file brief out-of-time was
not abuse of discretion.
Petition for review denied.

West Headnotes

**Aliens, Immigration, and Citizenship** 24
⊜353(1)

24 Aliens, Immigration, and Citizenship
　24V Denial of Admission and Removal
　　24V(E) Administrative Procedure
　　　24k351 Administrative Review
　　　　24k353 Time Limitations
　　　　　24k353(1) k. In General. Most Cited
Cases
Board of Immigration Appeals' denial of alien's
motion to file brief out-of-time on review from denial
of applications for asylum, withholding of removal,

and relief under Convention Against Torture (CAT)
was not abuse of discretion; alien failed to show that
visa was immediately available, and government
opposed motion.

*265 On Petition for Review of an Order of the
Board of Immigration Appeals. (A95-223-548).
Ronald D. Richey, Law Office of Ronald D. Richey,
Rockville, Maryland, for Petitioner. Peter D. Keisler,
Assistant Attorney General; M. JocelynLopez
Wright, Assistant Director; Kathryn L. Moore, Office
of Immigration Litigation, United States Department
of Justice, Washington, D.C., for Respondent.

Before WILLIAMS, MICHAEL, and KING, Circuit
Judges.

Petition denied by unpublished PER CURIAM
opinion.
Unpublished opinions are not binding precedent in
this circuit.PER CURIAM:
**1 Jean Marc Nken, a native and citizen of
Cameroon, petitions for review of an order of the
Board of Immigration Appeals ("Board") dismissing
his appeal from the immigration judge's order
denying his applications for asylum, withholding
from removal and withholding under the Convention
Against Torture ("CAT"). He also seeks review of
the denial of his motion to remand. We deny the
petition for review.

The Immigration and Naturalization Act (INA)
authorizes the Attorney General to confer asylum on
any refugee. 8 U.S.C. § 1158(a) (2000). The INA
defines a refugee as a person unwilling or unable to
return to his native country "because of persecution
or a well-founded fear of persecution on account of
race, religion, nationality, membership in a particular
social group, or political opinion." 8 U.S.C. §
1101(a)(42)(A) (2000). An applicant can *266
establish refugee status based on past persecution in
his native country on account of a protected ground.
8 C.F.R. § 1208.13(b)(1) (2006). Without regard to
past persecution, an alien can establish a well-
founded fear of persecution on a protected ground.
Ngarurih v. Ashcroft, 371 F.3d 182, 187 (4th
Cir.2004).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

227 Fed.Appx. 265                FOR EDUCATIONAL USE ONLY                                    Page 2
227 Fed.Appx. 265, 2007 WL 1037391 (C.A.4)
**(Cite as: 227 Fed.Appx. 265, 2007 WL 1037391 (C.A.4))**

An applicant has the burden of demonstrating his eligibility for asylum. 8 C.F.R. § 1208.13(a) (2006); *Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 353 (4th Cir.2006). A determination regarding eligibility for asylum is affirmed if supported by substantial evidence on the record considered as a whole. *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). This court will reverse the Board "only if the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Rusu v. INS*, 296 F.3d 316, 325 n. 14 (4th Cir.2002) (internal quotation marks and citations omitted).

We conclude that substantial evidence supports both the immigration judge's adverse credibility finding and its ultimate findings that Nken is ineligible for asylum, withholding of removal, and protection under the CAT. Accordingly, we will not disturb the Board's final order affirming the immigration judge's decision.

We also conclude the Board did not abuse its discretion denying Nken's motion to file a brief out of time. With respect to the motion to remand, because Nken did not show that a visa was immediately available to him and the Government opposed the motion, we find the Board did not abuse its discretion denying the motion. *See* 8 U.S.C. § 1255(a) (2000); *Onyeme v. INS*, 146 F.3d 227, 231 (4th Cir.1998); *Matter of Velarde-Pacheco*, 23 I. & N. Dec. 253 (B.I.A.2002).

Accordingly, we deny the petition for review. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*PETITION DENIED.*

C.A.4,2007.
Nken v. Gonzales
227 Fed.Appx. 265, 2007 WL 1037391 (C.A.4)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Attachment F**

**Decision of the Board of Immigration Appeals**



U.S. Department of Justice                    Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041

File:   A95 223 846 - Baltimore                          Date:

In re:  JEAN MARC NELON                                            AUG 1 2 2004

IN REMOVAL PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Juan C. Washington, Esquire

ON BEHALF OF DHS:          Arthur H. Gottlieb
                           Assistant Chief Counsel

CHARGE:

    Notice:  Sec.    237(a)(1)(B), I&N Act [8 U.S.C. § 1227(a)(1)(B)]
                     In the United States in violation of law

APPLICATION:   Asylum; withholding of removal; Convention Against Torture

ORDER:

    PER CURIAM. The respondent appeals from the Immigration Judge's April 23, 2003, denial of his applications for asylum and withholding of removal pursuant to sections 208(a) and 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a), 1231(b)(3), and for protection under the Convention Against Torture. See 8 C.F.R. §§ 1208.16(c), 1208.18. On appeal, the respondent contends that the Immigration Judge erred by denying him relief. The Immigration Judge raised numerous problems relating to the respondent's credibility and her ultimate conclusion finding the respondent to be ineligible for relief appears to be based largely on the credibility problems. We observe, however, that the Immigration Judge did not make a specific adverse credibility finding in this instance. Under our standard of factual review, we cannot make a de novo determination of credibility on appeal. See 8 C.F.R. §§ 1003.1(d)(3)(i), (ii). Consequently, the record is remanded to the Immigration Court to make a specific credibility finding in accordance with the standards articulated by the Board.

_____
              FOR THE BOARD

U. S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Baltimore, Maryland

File A 95 223 548                                    April 23, 2003

In the Matter of

JEAN MARC NKEN,                    )            IN REMOVAL PROCEEDINGS
                                   )
              Respondent           )

CHARGE:          Section 237(a)(1)(B) of the Immigration and
                 Nationality Act - remained in the United States
                 for longer time than permitted

APPLICATIONS:    Section 208A of the Immigration and Nationality
                 Act, asylum; Section 241(b)(3) of the Immigration
                 and Nationality Act, withholding of removal;
                 withholding of removal under the U. N. Convention
                 Against Torture and other Forms of Cruel, Inhuman,
                 or Degrading Treatment or Punishment (Torture
                 Convention)

ON BEHALF OF THE RESPONDENT:         ON BEHALF OF THE GOVERNMENT:

Mr. Juan C. Washington, Esquire      Mr. Arthur Gottlieb
966 Hungerford Drive, Suite 12       Assistant District Counsel
Rockville, Maryland 20850            Baltimore, Maryland


          ORAL DECISION OF THE IMMIGRATION JUDGE

          The respondent is a native and citizen of Cameroon who

was admitted to the United States at Miami, Florida on or

about April 1, 2001 as a non-immigrant, C-4 (transit), with

authorization to remain in the United States for a temporary

period not to exceed April 9th, 2001. He remained thereafter

without authorization from the Immigration and Naturalization

Service (now known as the Department of Homeland Security).

On or about February 12th, 2002 he was served with a Notice to Appear by the INS, see Exhibit 1. In the NTA, the INS charges the respondent with being removable as set forth above. At a master calendar proceeding the respondent admitted the factual allegations contained in the Notice to Appear and conceded his removability from the United States. He did not designate a country of removal should that become necessary. The Court designated Cameroon. Based on the respondent's concession of removability, this Court does find that his removability has been established by clear and convincing evidence in accordance with Section 240 of the Act.

On or about December 13th, 2001, the respondent filed an asylum application, Form I-589, with the INS. This application was subsequently referred to the Immigration Court by the INS pursuant to 8 C.F.R. Section 208.14. The I-589 and the documentation attached thereto, including the respondent's affidavit, has been marked into evidence as Group Exhibit 2. The respondent is seeking asylum from Cameroon based on his testimony that on account of his opposition activities, he was arrested and detained on two different occasions in Cameroon. He fears returning to that country at the present time. His application for asylum is also deemed to be an application for withholding of removal pursuant to Section 241(b)(3) of the Act and withholding under the Torture Convention.

had been deported, he stated that he was not quite sure what happened. He simply appeared before someone who was perhaps not a judge, and he was given permission to move and noted his arrival in the United States in April of 2001. He stated that in April of 2001, he did not return to Cameroon because he had "enormous problems" in that country and his life would be in danger if he returned. He stated that he was arrested on two different occasions in Cameroon on account of his anti-government activit

His first arrest occurred in October of 1990. He stated that at this time, he was a student at the University of Yaounde and a member of a student organization which was the forerunner to what was later known as Parliament. He stated that he was arrested while participating in a demonstration, a student demonstration, against the government. The purpose of the demonstration was to protest against the government's refusal to permit free speech and democracy in that country. The respondent stated that he was an influential member of this particular organization. He was questioned by the Government with reference to a letter from a friend of his, or teb 1, which states that the respondent was secretary general of this particular organization, as well as being a propaganda delegate. The respondent stated that this letter was incorrect insofar as it states that he was a secretary general. He was merely a propaganda delegate. Additionally, his updated affidavit advises that he was instrumental in organizing

this march, whereas his first affidavit attached to his asylum application, makes no mention of any leadership role in this student organization or any involvement in the planning of this march. He stated that his first attorney was not very helpful in preparing this particular application, hence, the lack of detail in the first affidavit.

He stated that while participating in this march, the police descended on the marchers, threw water on them, and chased them with batons. More than a 1,000 people were participating in the demonstration. The respondent stated that he was in fact arrested and brought to a nearby police station. He was kept there for a few hours and then brought to another location known as the Americana prison in Yaounde. He was detained at this prison for approximately one month. He was interrogated frequently and beaten frequently when he did not respond in a manner satisfactory to his captors. He was questioned about his ethnicity, his family, and about who was behind this particular student organization. He stated that, as mentioned above, he was beaten on several different occasions and could not recall exactly how many times he was beaten.

He stated that he was simply released one day when two guards came to his cell, told him to get dressed, and then drove him to the downtown Yaounde where they simply let him go. He stated that he stopped a taxi who brought him to the home in Yaounde, where he had been living with his brother, Lucie. His

active member of this organization and he then, from 1994 to 1997, became the general secretary. His responsibilities as general secretary were to organize meetings, find meeting locations, and to keep notes and important documentation.

He stated that this particular student organization participated in three sit-in type situations at the Cameroonian Embassy in Cameroon. The first occurred in 1993. The purpose of this sit-in was to try to ameliorate the students in Cameroon who were being mistreated. He stated that as a result of this sit-in, he and others were arrested by the Ivory Coast police and detained for a few days. In June of 1997, the students presented a petition to the Cameroonian Embassy. They had received a report that the legislative elections of May had been fraudulent. They were petitioning for their elections. The third sit-in at the Cameroonian Embassy in the Ivory Coast occurred in October of 1997, a week before the upcoming presidential elections. The purpose of bringing a petition to the Cameroonian Embassy was to petition for fair elections in that country.

He stated that he left the Ivory Coast in December of 2000. There was a coup d'etat in the Ivory Coast and security was rampant. Foreigners were no longer regarded kindly. He was harassed and thus he felt he needed to leave Cameroon. He therefore contacted his father who told him to return to Cameroon. He stated that this was the first time that he

language.

He was questioned with reference to a letter, to be located at tab N, the author residing in Silver Spring, Maryland. He stated that this individual was not a witness because he was perhaps too frightened to appear.

He was questioned by the Government as to how he supported himself in the Ivory Coast from January of 1991 to July of 2000 while he was studying. He stated that he supported himself through the student union and at times his father helped him. It was then pointed out to him by the Government that he had a pay slip from Africare dated 1995 with an annual salary. He stated that this was a paid internship and when he stated that he was supported through students and his father, he was referring only to before 1995.

STATEMENT OF THE LAW

The respondent bears the evidentiary burdens of proof and persuasion in any application for withholding of removal under Section 241(b)(3) or asylum under Section 208 of the Act. Matter of Acosta, 19 I&N Dec. 211 (BIA 1985); modified, Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987).

An alien seeking asylum in the United States bears the burden of establishing that he or she meets the refugee definition of Section 101(a)(42)(a) of the Act. Matter of S-P-, Int. Dec. 3287 (BIA 1996). Meeting this burden, the respondent must demonstrate that he or she has suffered past persecution on

account of race, religion, nationality, membership in a particular social group, or political opinion and must satisfy the well-founded fear standard of eligibility required for asylum under Section 208 of the Act.  See INS v. Cardoza-Fonseca, 480 U.S. 421 (1987).

To satisfy the well-founded fear standard, the respondent must show that a reasonable person in his circumstances would fear persecution.  Matter of Mogharrabi, Int. Dec. 3078 (BIA 1988).

To be eligible for withholding of removal pursuant to Section 241(b)(3) of the Act, an alien's facts must show a clear probability of persecution in the country designated for removal on account of race, religion, nationality, membership in a particular social group, or political opinion.  INS v. Stevic, 467 U.S. 407 (1984).

To be eligible for relief under the Torture Convention, an alien must show that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal.  See 8 C.F.R. Section 208.16(c).

ANALYSIS

Based on the totality of evidence, this Court must find that the respondent has failed to meet his burden in establishing past persecution or that he has a well-founded fear of future persecution should he return to Cameroon at the present time.  In light of this finding, this Court need not and will not address

the issue of respondent's firm resettlement in the Ivory Coast.

1.   At the outset, this Court finds improbable respondent's actions in allegedly fleeing from Cameroon in 1990. He stated that he was fleeing for his life, yet this Court finds it curious that upon reaching a safe haven in Cameroon he did not apply for asylum in that country.  he has produced no evidence that he could not do so.  Moreover, the Court finds it very curious that the respondent could enter the Ivory Coast and almost immediately apply for and be accepted to the university in that country despite being a foreigner.  In sum, this Court queries whether or not the respondent had indeed applied to school in the Ivory Coast before leaving to Cameroon and indeed proceeded to the Ivory Coast for the purpose of going to school.

2.   With reference to political activities in Cameroon in 1990, this Court notes the letter from respondent's friend at the L, which, in sum, states that the respondent was secretary general of a student organization in Cameroon in addition to being a propaganda delegate.  The respondent states that he was never the secretary general of the student organization.  This Court questions the basis for this author's statement.

3.   This Court notes that respondent's original asylum application makes no mention of having any leadership role in the student organization despite his testimony today that he was a propaganda delegate.  His original application makes no mention of his having helped the organization plan the 1990

demonstration, which resulted in his arrest. This Court notes that he was assisted by an attorney with his original application.

4.    This Court notes the following: Respondent testified that upon his release from prison in 1990 in Cameroon, he went to his home in Yaounde where he and his brother had lived together. His brother paid for his taxi. He then went to his father's home in Douala, 300 kilometers away, traveling by a bus. His updated affidavit states that he immediately went to his father's home where his brother was waiting, and the brother paid for the taxi.

This Court further questions how after having been detained for a month and having been beaten in the manner in which he so described, the respondent was able physically to take a 300 kilometer bus trip.

5.    This Court notes the incorrect English in the summons that respondent stated was issued against him in Cameroon, i.e. the use of the word "abits" for presumably the word "abide"; the use of the phrase "holding and identification" supposedly instead of "holding an identification" and finally, "you shall be forced to come with extra punishment" a phrase, which quite frankly, makes no sense.

This Court notes that this summons, an official government document, has not been authenticated pursuant to 8 C.F.R. 287.6 and this Court gives it de minimis weight.

6.    This Court notes respondent's vagueness and evasiveness when questioned by the Government as to how he supported himself for 10 years in the Ivory Coast.  He stated initially, when questioned by the Government as to how he supported himself between 1991 and 2000, that he was supported with the assistance of the student union and occasionally his father.  It was only when it was pointed out to him that he had presented a pay slip from Afrigare showing an annual salary, that he then stated, oh yes, after 1995 he was involved in a paid internship.  Indeed respondent's evasiveness in answering this question leads this Court to question what exactly the respondent was doing in the Ivory Coast for 10 years.

7.    This Court further notes his evasiveness when questioned as to what happened to him in the Bahamas.  This Court seriously doubts that he would not be permitted to apply for political asylum because there were no forms available.  This Court further seriously doubts that he would be detained for one month in the Bahamas and yet not be informed as to why he was being so detained.  This Court again queries as to exactly what was respondent's situation in the Bahamas, and this Court doubts that the respondent was being totally forthcoming with the Court.

8.    This Court further finds curious, with reference to his second arrest, that the respondent, who said that he was beaten on numerous occasions while detained in Douala, would not seek medical assistance in Douala when released from prison,

Indeed he traveled 300 kilometers to Yaounde where he sought medical treatment for nose bleeding, back injuries, and abdominal pains, and apparently a balance problem. When questioned as to why this was so, the respondent stated that the primary purpose of his trip to Yaounde was not to seek medical attention. This Court therefore questions whether or not the respondent was indeed injured as he so stated while in detention and indeed, whether or not he was detained as he so claims. This Court notes that the letters that he has submitted on his behalf have not been notarized and thus this Court has no way of determining their authors. Furthermore, he has presented no proof as to the relationship to his alleged father and brother who wrote letters on his behalf. Thus based on the totality of evidence, this Court does find that the respondent has failed to meet his burden in establishing past persecution or that he has a well-founded fear of future persecution should he return to Cameroon at the present time. Inasmuch as the respondent has failed to satisfy the lower burden of proof required for asylum, it follows that he has failed to satisfy the clear probability standard of eligibility for withholding of removal under INA Section 241(b)(3).

For the aforementioned reasons, this Court also finds that the respondent has failed to meet his burden in establishing that it is more likely than not that he would be tortured as contemplated by the Torture Convention were he to return to

A 95 223 548                     14                     April 23, 2008

Cameroon at the present time. The respondent was not physically present in the United States for one year prior to service of the Notice to Appear and thus is statutorily ineligible for voluntary departure. Accordingly, the following orders are entered.

<u>ORDERS</u>

IT IS HEREBY ORDERED that the respondent's application for asylum be denied.

IT IS HEREBY FURTHER ORDERED that the respondent's application for withholding of removal under INA Section 241(b)(3) be denied.

IT IS HEREBY FURTHER ORDERED that the respondent's application for relief under the Torture Convention be denied.

IT IS HEREBY FURTHER ORDERED that the respondent be removed and deported from the United States to Cameroon on the charge contained in the Notice to Appear.

JILL DUFRESNE
Immigration Judge